UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
C.L.K. and J.K. individually, and as Parents
of C.K., a minor under the age of 18 years.

        Plaintiffs,

                                        12 Civ. 7834 (NSR)

      - against -                    **Opinion & Order**

Arlington School District.

        Defendant.
------------------------------------------------------------X

**NELSON S. ROMÁN, United States District Judge:**

        Before the Court is Plaintiffs' and Defendant's cross motions for summary judgment. For

the reasons set forth below, this Court now grants Defendant's motion for summary judgment.

FACTS

        This action arises in the context of a special education appeal grounded in the Individuals

with Disability Act ("IDEA") and Article 89 of the New York State Education Law. *See*

Affidavit of Triesha Foglia, sworn to on September 3, 2013, hereinafter referred to as the "Foglia

Aff." ¶ 4. Federal and state law assures that all children with disabilities have available a free

appropriate public education ("FAPE") designed to meet their unique learning needs. *See* Foglia

Aff. ¶ 3. The primary mission of the District's Committee on Special Education ("CSE") is to

identify, locate, and evaluate all disabled children within the District's borders and develop

individualized education programs ("IEPs") that address their educational needs. *See* Foglia Aff.

¶ 3.

C.K.'s classification and eligibility for special education programs and services are not in dispute. *See* Foglia Aff. ¶ 9. The plaintiffs object to the conclusions of the State Review Officer of the New York State Education Department ("SRO"), that the District offered C.K. FAPE in the least restrictive environment ("LRE"), and the dismissal of their request for tuition reimbursement and travel costs associated with their unilateral placement of C.K. at the Pathways School ("Pathways") during the 2011-12 school year. *See* Foglia Aff. ¶ 4. Pathways holds itself out as specializing in the remediation of students with autism, however Pathways has not been approved by the New York State Education Department to instruct students with disabilities. *See* Foglia Aff. ¶ 100.

The SRO found that an overall review of the hearing record showed that despite a decline in formal test scores, C.K. functionally made progress in school academically, socially, and emotionally during prior school years leading up to the May 2011 IEP. *See* Foglia Aff. ¶ 8. The SRO found that the May 2011 CSE carefully and accurately described the student's present levels of academic achievement, social development, physical development, and management needs, and that the description was consistent with the evaluative information that was available to the CSE. *See* Foglia Aff. ¶ 8. The SRO further found that the District's recommended program for the 2011-12 school year was designed to address the student's instructional needs and was reasonably calculated to enable the student to receive educational benefits which offered C.K. FAPE in the LRE, thus denying tuition and transportation costs to Pathways. *See* Foglia Aff. ¶ 8.

At the time of the underlying impartial hearing, which was conducted on six days (November 18, 2011, December 2, 2011, January 11, 2012, January 12, 2012, January 13, 2012, and January 18, 2012), C.K. was an 11-year-old, 6th grade student with a classification of

2

Autism, who attended the Pathways school in Eastchester, New York, as a day student. *See* Foglia Aff. ¶ 9.

Pathways has not been approved by the Commissioner of Education as a school with which public school districts in this State may contract to instruct students with disabilities. *See* Foglia Aff. ¶ 9. Boards of education in New York have no authority to contract for the placement of a child with a disability in a private school that has not been approved by the New York State Education Department to instruct students with disabilities. *See* Foglia Aff. ¶ 100; N.Y. Educ. Law § 4402(2)(b)(2). Pathways does not follow the New York State curriculum and instead presents students with concepts that would be encompassed in different grade levels.

Prior to attending Pathways, C.K. attended the District's schools. She was described as motivated, hardworking, determined, pleasant, cooperative and willing to try, despite her challenges. *See* Foglia Aff. ¶ 10.

In 3rd grade, the 2008-09 school year, C.K. attended a self-contained Autism program, taught by Lynn Sangaline, certified special education teacher, with twenty years of experience working with students on the autism spectrum. C.K. remained in the program through the end of 5th grade. *See* Foglia Aff. ¶ 11. This is a very specialized, intensive learning program where opportunities were offered for one-to-one, small and whole group instruction and stressed language and social skills. *See* Foglia Aff. ¶ 12. Speech language therapy was incorporated into the program and opportunities for mainstreaming were provided. *See* Foglia Aff. ¶ 12.

In 3rd grade, C.K. had good days and bad days; days when she was able to focus better than others. *See* Foglia Aff. ¶ 13. Academically, C.K. started as a non-reader who could only read five to ten words consistently. She was unable to write a simple sentence. She was unable to

3

add, subtract or multiply. *See* Foglia Aff. ¶ 13. Socially, she was anxious to be with other students. Although she had opportunities for mainstreaming with specials, it went slowly. There were times when she was resistant to instruction, would shut down, sometimes cry to be angry and would have a difficult time expressing why. *See* Foglia Aff. ¶ 14.

In 4th grade, 2009-10, C.K. cautiously adjusted to a larger class (two to seven students); was mainstreamed for specials; would occasionally push into a 3rd grade class; and became class representative in student government. Socially, she was showing them how much she enjoyed being in the mainstream. *See* Foglia Aff. ¶ 15.

In 5th grade, 2010-11, C.K. made slow and consistent progress in reading and started to show more interest. *See* Foglia Aff. ¶ 16. In speech therapy, C.K.'s confidence level grew. She appeared ready to learn; shutting down was rare, but if she did, she was able to work through it more quickly and efficiently. Her disfluencies were minimal. She was capable of following three step directions. She made progress with sequencing and re-telling of narratives. *See* Foglia Aff. ¶ 17. C.K. had good use and understanding of language was able to listen to what was asked of her and formulate answers on target. *See* Foglia Aff. ¶ 17. C.K. was happy, confident, and social. She helped other students in the classroom, said hello to students and teachers in the hallway and enjoyed going to the mainstream class, which was scheduled after speech. *See* Foglia Aff. ¶ 18. C.K. participated in the mainstream 5th grade Science and Social Studies class, with a teacher's assistant, and her needs were accommodated in the classroom. *See* Foglia Aff. ¶ 19. In the beginning, C.K. was very nervous in class but then warmed up and eventually began participating in group projects and working with other students. Avoidance behaviors were not seen. *See* Foglia Aff. ¶ 19. Academically in the mainstream classes, C.K. struggled with writing

4

but was given opportunities to speak her responses. In one particular research project, C.K. was able to stand in front of the room and present from a PowerPoint presentation. On another occasion, C.K. participated in a group activity where she delegated jobs to other students. *See* Foglia Aff. ¶ 20. Socially, she made a lot of growth. She was able to socialize appropriately with the other 5th graders. *See* Foglia Aff. ¶ 21. At first, C.K. was not aware of personal space during conversation but by the end of the year, she understood personal space. She would speak and interact appropriately with others. *See* Foglia Aff. ¶ 21. It was observed the she benefitted by learning to model the typical students in the class. *See* Foglia Aff. ¶ 21.

In 5th grade, C.K. received occupational therapy ("OT") and physical therapy ("PT") services from licensed therapists as her gross and fine motor skills were very impaired. *See* Foglia Aff. ¶ 22. C.K. had low tone throughout her body, which made it difficult for her to sit for long periods of time without slouching, leaning or holding her head with both arms. She had difficulty with visual tracking, which was reflected in her writing and her ability to copy from the board. She had motor planning problems, which affected her speed. Her writing was legible, but large for her age. *See* Foglia Aff. ¶ 23. From September 2010 to June 2011, C.K. improved in her OT skills. She developed good postural control. She was able to sit for longer amounts of time. Her writing was smaller and legible. Her keyboarding was improving, as well as her fine motor skills, visual perceptual ability, and ability to copy from the board. *See* Foglia Aff. ¶ 24. In PT, C.K. presented with incoordination in her muscle movements, ataxia (jerky movements), and unawareness of where her body was in space, poor endurance, overall muscle weakness, compromised dynamic balance and motor planning issues. It was challenging for C.K. to use a large therapy ball or stand on an unstable surface. *See* Foglia Aff. ¶ 25. In the classroom if she got up from her chair to line up at the door, she would bump into students or knock her books off

the table. She would lean on walls and stumble. She was unaware of where her arms were and had a lot of jerky arm movements as she walked down the hall. With stairs, she had poor shaft awareness, and would stumble which made her unstable motorically. *See* Foglia Aff. ¶ 25. Towards the end of the year, C.K. was able to walk to and from her classroom by herself. She was able to negotiate staircases by herself with her arms by her side, without bumping into anything or stumbling. C.K.'s biggest improvement was her awareness of her body in space. *See* Foglia Aff. ¶ 26. There were small improvements with dynamic balance, improvement in motor planning and endurance. Although C.K. still required rest periods during a 30 minute session, they were much less. C.K. had also developed compensatory strategies to handle her ataxia, which also improved. *See* Foglia Aff. ¶¶ 26 & 27. C.K. showed improvement in making eye contact. She was able to listen and follow three step directions, where in the beginning of the year, it was only one. *See* Foglia Aff. ¶ 27. There were also gains with gross motor function, muscle strength and upper body strength. In September, she was unable to wheelbarrow and would collapse right away. By the end of the year, she could walk a few feet. *See* Foglia Aff. ¶ 28.

On May 27, 2011, the CSE met for C.K.'s annual review and recommendations for 6th grade. *See* Foglia Aff. ¶ 29. The CSE reviewed an independent neuropsychological evaluation by Dr. O'Leary that indicated that C.K.'s intellectual ability was within average range, as were verbal comprehension and perceptual reasoning. *See* Foglia Aff. ¶ 30. The results regarding C.K.'s intellectual ability were consistent with previous administrations of cognitive testing. *See* Foglia Aff. ¶ 30.  C.K.'s teachers and service providers disagreed with portions of Dr. O'Leary's report, such as: the description of C.K. attempting to escape demands, as it was described that she often needed time to formulate responses; the standard score of 6 on the Understanding

6

Spoken Paragraphs, since she was such a strong auditory learner; and the low score on Concepts and Following Directions, as it was described that there was a motor component involved and C.K. had shown she was able to follow multi-step auditory directions. *See* Foglia Aff. ¶ 31.

The CSE recommended that C.K. attend the Union Vale Middle School and receive integrated co-teaching services ("ICT") every other day for her core academic subjects: English Language Arts ("ELA"), Math, Social Studies and Science; Special class Study Skills daily; Special class Reading daily; Consultant teacher services ("CTS") for Writing and Math every other day. *See* Foglia Aff. ¶ 32. Related services included: speech language therapy in a group twice a week and individually once a week; individual OT once a week; and individual PT twice a week. *See* Foglia Aff. ¶ 32. The CSE also recommended program modifications including: a copy of class notes, leave class before bell, refocusing and redirection, directions repeated and revised, visual supports, break down assignments into smaller segments, access to word processor and check for understanding; test accommodations including: extended time (2.0), special location, refocus and redirect, test passages, questions, items and multiple choice responses read to the student, language in directions simplified and revised; and a 1:1 aide throughout the school day to assist her in negotiating the school environment. *See* Foglia Aff. ¶ 32. The CSE also recommended goals (most of which would have been addressed, by more than one teacher, and in more than one class) to target her documented deficits in the areas of study skills, reading, math, writing, speech, OT and PT. *See* Foglia Aff. ¶ 33. Graph paper was recommended as a visual technique to help align numbers, assist with handwriting ability and keep assignments organized. *See* Foglia Aff. ¶ 36. The CSE recommended the use of a computer as a compensatory strategy and computers were available in each of her classes. *See* Foglia Aff. ¶

37. To address the spelling goal, strategies included: the Read to Write program (word prediction and spelling); review of vocabulary; and spell check on the computer. *See* Foglia Aff. ¶ 42.

At the end of the meeting, the parents declined the CSE's recommendation and gave the CSE a list of programs that they wanted considered. *See* Foglia Aff. ¶ 50. The SAIL program, housed at the Bedford School District, was a program for severely autistic students, many of which were nonverbal, alternately assessed and on a path toward an IEP diploma. Based on C.K.'s description of being verbal, an auditory learning, doing well in language, and participating in the mainstream 5th grade class, Bedford opined that it was not an appropriate program, and too restrictive. *See* Foglia Aff. ¶ 51. The Eastchester Union Free School District was given information from Dr. O'Leary's report regarding C.K.'s academic and cognitive levels and some anecdotal information from the annual review, to which they stated they had a very similar program to what the District had recommended and opined that it was not practical to recommend a similar program with such a long commute. *See* Foglia Aff. ¶ 52. The Pleasantville Union Free School District informed the District that they were not taking any outside referrals for the school year. *See* Foglia Aff. ¶ 53.

Ms. Foglia shared her findings with the parents in two separate letters and informed them that Dutchess BOCES had similar programs as SW BOCES available locally in district based programs, specifically C.K.'s home school, Union Vale and offered to reconvene a CSE meeting if they were interested in discussing the Dutchess BOCES programs. Plaintiffs never contacted her. *See* Foglia Aff. ¶ 55. Ms. Sangaline also looked into another District program, similar to hers, at the LaGrange middle school. However, the students going into that program still required work on their social skills and C.K. no longer needed that. *See* Foglia Aff. ¶ 56. Ms. Sangaline

opined that C.K. was moving at a good pace and that with adult support she would continue to make progress with her same age peers, which she believed was very critical for C.K. *See* Foglia Aff. ¶ 56.

On August 12, 2011, the District received a 10-day notice with a letter from the parents detailing concerns they had with the recommendations in the May IEP. *See* Foglia Aff. ¶ 57. Based on the parents' concerns (not previously expressed at the May CSE meeting) a CSE meeting was scheduled for September 15, 2011, to include teachers and service providers who would provide C.K. services at the middle school. *See* Foglia Aff. ¶ 57.

On September 7, 2011, the District received an impartial hearing request asserting that the District did not provide C.K. with FAPE for the 2011-12 school year; that the IEP failed to provide for C.K. in the areas of academic achievement, functional performance, social development, physical development, and management needs; and that C.K. had failed to advance academically and socially. *See* Foglia Aff. ¶ 58.

The September 15, 2011 CSE reviewed that C.K. was a complex learner who had significant learning issues in reading, writing and math, with deficits in apraxia, motor planning, and the speed of her output of work was poor. *See* Foglia Aff. ¶ 59.

The staff at Union Vale presented a very clear picture of what services C.K. would receive in the ICT classes, which were taught at a slower pace. *See* Foglia Aff. ¶ 60. Each ICT class was taught by a certified regular education teacher and a certified special education teacher who was in the classroom everyday providing support. *See* Foglia Aff. ¶ 60. The teachers collaborated and used a team approach, used the smart board, used groups with high level and low level learners, used a multi-sensory approach and provided program modifications and

testing accommodations. *See* Foglia Aff. ¶ 60. CTS math was an additional level of support through additional reinforcement of Math concepts, IEP goals, basic skills and concepts taught in the classroom, which would be provided every other day. *See* Foglia Aff. ¶ 61. Special Class Reading class was described as a highly effective, multi-sensory program developed for students who were good auditory learners, with average IQs but who were coming to middle school and reading at a second, third or even first grade level. *See* Foglia Aff. ¶ 62.

The parents expressed dissatisfaction with the fact that the IEP did not include a small bus for transportation or Assistive technology in the home. The parents requested a functional behavior assessment ("FBA") by an outside consultant and questioned communication between staff and home. *See* Foglia Aff. ¶ 64.

The CSE recommended goals in reading, writing, math, and study skills. To address C.K.'s speech language needs she would have received one individual speech session plus two group sessions a week to address pragmatic language, oral motor therapy and communication. *See* Foglia Aff. ¶ 69. To address C.K.'s OT needs, the CSE recommended OT two times a week individually to address motor planning, core strength and sensory integration. *See* Foglia Aff. ¶ 79. To address C.K.'s PT needs, the CSE recommended individual PT twice a week to address balance, trunk stability, motor planning, bilateral control, safety, and transitioning to a new environment. *See* Foglia Aff. ¶ 83. The one on one aide was recommended to assist C.K. with managing the classroom, arriving on time, using a planner, keeping up with classwork, making sure she is safely managing transitions within the classroom and beyond the classroom, including hallways and busy areas. *See* Foglia Aff. ¶ 93.

A parent who believes that an IEP is insufficient may challenge it at a hearing before an impartial hearing officer ("IHO") appointed by the local school district. 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). "At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 379 (2d Cir. 2003). By decision dated March 11, 2012, the IHO found a violation of FAPE. *See* Foglia Aff. ¶ 94. "The decision of an IHO may be appealed to a SRO, ... [which] may in turn be challenged in either state or federal court." *Id.* at 380 (citing 20 U.S.C. § 1415(g), (i); N.Y. Educ. Law § 4404(2)); *see also* N.Y. Educ. Law § 4404(1)(c). During these challenges, the "pendency" provisions of both IDEA and New York State Education Law require that a student remain in his or her then-current educational placement, and that the New York Department of Education continue to fund that placement, pending final disposition of, *inter alia,* a challenge to a child's IEP. 20 U.S .C. § 1415(j); N.Y. Educ. Law § 4404(4)(a); *Mackey ex rel Thomas M. v. Bd. of Educ. for the Arlington Cent. Sch. Dist.,* 386 F.3d 158, 163 (2d Cir. 2004). The District appealed the IHO's decision to the SRO and on July 6, 2012, the SRO reversed the IHO's decision and found that the District did offer C.K. FAPE in the LRE for the 2011-12 school year. *See* Foglia Aff. ¶ 94.

The IEP and program recommended for the 2011-12 school year for C.K. was developed by an appropriately comprised CSE subcommittee where evaluations, updated testing and progress were reviewed and discussed. *See* Foglia Aff. ¶ 96. The District made provisions to improve C.K.'s reading, writing, math and study skills deficits by recommending and placing her in collaborative classes taught by both a certified regular education teacher and certified special education teacher; special classes to support study skills and reading; and consultant teacher classes to support math and writing. *See* Foglia Aff. ¶ 96. The IEP accurately reflected C.K.'s

strengths and needs, reported C.K.'s most recent levels of performance and indicated her individual learning needs in the areas of cognitive functioning, academics, social development, physical development, and management needs. *See* Foglia Aff. ¶ 97. The IEP also established annual goals that addressed study skills (including organization, refocusing, visual prompts and grammar), reading (including decoding and comprehension), writing (including spelling), math, speech language weaknesses (including fluency, pragmatics, and following directions), social/emotional, motor (including gross and fine motor and sensory), and were reasonably related to her educational deficits. *See* Foglia Aff. ¶ 138. The goals contained evaluation criteria, the procedure that would be used to evaluate the goal and a schedule that indicated a time frame for measuring each goal. *See* Foglia Aff. ¶ 98. The program had a start date of September 7, 2011 and an end date of June 22, 2012. *See* Foglia Aff. ¶ 99. The program allowed for C.K. to be mainstreamed with typical peers.

On September 5, 2013, the District moved for summary judgment. Plaintiffs replied and cross-moved for summary judgment on October 21, 2013.

## DISCUSSION

### I. IDEA

Congress enacted IDEA "to ensure that all children with disabilities are provided a [("FAPE")]." *Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 239, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009). To meet the requirements of IDEA, a school district must provide each student with a disability with a FAPE "that emphasizes special education and related services" tailored to meet the student's unique needs. 20 U.S.C. §§ 1400(d)(1)(A), 1401(9); *accord Walczak v. Florida Union Free Sch. Dist.,* 142F.3d 119, 122 (2d Cir. 1998).

The "central mechanism by which public schools ensure that their disabled students receive a free appropriate public education" is an individualized education program ("IEP"). *Polera v. Bd. of Educ.,* 288 F.3d 478, 482 (2d Cir. 2002); *see also* 20 U.S.C. §§ 1401(9), 1414(d). An IEP is a written statement, collaboratively developed by a child's parents and educators, that sets out, *inter alia,* a child's present levels of academic achievement and functional performance, annual academic and functional goals, how a child's progress towards those goals will be measured, and the services that will be provided to the child. 20 U.S.C. § 1414(d)(1); *Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir. 2006). In New York, the team that creates an IEP is called a CSE and, as relevant here, must include: one or more of the student's parents; the student's regular education teacher if the student is or may be participating in a regular education environment; the student's special education teacher or provider; and a school psychologist. N.Y. Educ. Law. §§ 4402(1)(b)(1)(a)(i)-(iv). New York law also requires that a CSE include several other individuals, such as a school district representative, *see id.* at §§ 4402(1)(b)(1)(a)(v)-(x), but these additional positions can be filled by one of the members already described or their presence can be waived. *See id.* at § 4402(1)(b)(1)(b).

Pursuant to Second Circuit precedent, "[a] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 254 (2d Cir. 2009) (internal editing and quotation marks omitted); *see also Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 107 (2d Cir. 2007).

In addition, IDEA requires states to provide special education and related services "in the least restrictive setting consistent with a child's needs," meaning that children with disabilities

13

should be educated, "'to the maximum extent appropriate,' together with their non-disabled peers." *Walczak*, 142 F.3d at 122 (quoting 20 U.S.C. § 1412(a)(5)). "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated [into special classes]." *Id.; accord Grim,* 346 F.3d at 379. "However, a school district is not required to provide 'every special service necessary to maximize each handicapped child's potential,' ... " *Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.,* 11 Civ. 3897, 2013 WL 25959, at *1 (S.D.N.Y. Jan.2, 2013) (Ramos, J.) (citing *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir. 2005) and *Walczak,* 142 F.3d at 132).

Typically, a district court that has determined that a defendant has impeded a student's right to a FAPE would then consider whether the student's parents are entitled to reimbursement for the costs of placing their child in an alternative setting. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) (providing for retroactive reimbursement to parents of the costs of their child's private placement if a hearing officer or court determines that the district failed to provide the child with a FAPE). Reimbursement is warranted only where, after the hearing, it is determined that the services offered by the school district are inadequate or inappropriate, the services selected by the parents are appropriate, and equitable considerations support the parents' claim. *See* Foglia Aff. ¶ 95. *See* 20 U.S.C. § 1412(A)(10)(C)(ii); 34 C.F.R. § 300.403(c). The district court is authorized to "grant such relief as the court determines is appropriate". 20 U.S.C. § 1415(i)(2)(C) (iii).

IDEA actions are generally resolved by district courts at the summary judgment stage. *K.S. v. N.Y.C. Dept. of Educ.,* No. 11 Civ. 7443, 2012 WL 4017795, at *6 (S.D.N.Y. Aug. 8, 2012). Although the parties have styled their submissions as motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary

judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 n. 3 (2d Cir. 2005) (citation omitted). As such, summary judgment in IDEA cases "often triggers more than an inquiry into possible disputed issues of fact." *Id.* at 83 n. 3. Rather, the court conducts an "independent" review of the administrative record. *Bd. of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (citation omitted).

District courts base their decisions on the "preponderance of the evidence", taking into consideration both the record of the administrative proceedings and any additional evidence provided by the parties. *Grim,* 346 F.3d at 380. "Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ.,* 553 F.3d 165, 171 (2d Cir. 2009). In reviewing a dispute over an IEP, the district court occupies "the paradoxical position of [being] both an independent fact finder and a judicial body bound to review and give deference to the findings of an administrative agency." *Wall v. Mattituck–Cutchogue Sch. Dist.,* 945 F.Supp. 501, 507 (E.D.N.Y. 1996)). Although a district court may not merely "rubber stamp" administrative decisions, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *T.Y. & K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak,* 142 F.3d at 129 (alterations omitted) (quoting *Rowley,* 458 U.S. at 206, 208).

15

Here C.K.'s parents felt that the class size offered in the IEP was larger than desired. Plaintiffs' concerns regarding class size and instructional programming are matters of educational policy, which courts defer to a state administrative officer. *See N.Y.C. Dep't of Educ. v. V.S.,* No. 10 Civ. 5120, 2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011) ("[Q]uestions of class size, teaching methodologies and educational environments involve exactly the types of educational policy issues that require district court deference to state administrative agencies."). In short, an independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206; *see Grim,* 346 F.3d at 383 (holding that the court may not "cho[ose] between the views of conflicting experts on a controversial issue of educational policy ... in direct contradiction of the opinions of state administrative officers who had heard the same evidence."). *See Reyes v. N.Y.C Dep't of Educ.,* No. 12 Civ. 2113, 2012 WL 6136493, at *6 (S.D.N.Y. Dec. 11, 2012). Accordingly, because the SRO's determination that the faculty-student ratio in the IEP offered C.K. a FAPE was supported by sufficient evidence, the conclusion will not be disturbed.

Plaintiffs have not provided additional evidence that was not considered by the state agency. "The deference paid to administrative proceedings is particularly warranted where ... the district court's decision [is] based solely on the administrative record." *A.C. & M.C. ex rel. M.C. v. Bd. of Educ.,* 553 F.3d 165, 171 (2d Cir. 2009). The court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* (citation omitted). Nonetheless, "the deference owed to an [administrative] decision depends on the quality of that opinion." *R.E.,* 694 F.3d at 189. Courts should afford more weight to administrative decisions that are "well-reasoned." *Id.* (citation omitted). Judicial deference "is

particularly appropriate when the state officer's review has been thorough and careful[.]" *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012) (citation omitted).

Since "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.'" *A.C.*, 553 F.3d at 171 (citation omitted). When the two administrative decisions, those of the SRO and the IHO, disagree, the court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189. "Accordingly, [a party] seeking to have a reviewing court credit an IHO's determination over an SRO's determination would benefit from calling [the court's] attention to an SRO's specific errors in law, fact, or reasoning." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 2013 WL 3868594, at *4 (2d Cir. 2013).

Here, Plaintiffs argue that the SRO erred by not incorporating the recommendations of Dr. O'Leary and Dr. McMahon, plaintiff's counsel's brother. Dr. O'Leary's testimony of C.K.'s objective indications of lack of progress conflicted with the observations of C.K.'s teachers. As far as appropriate educational methodology, Dr. O'Leary recommended Pathways, which uses the TEACCH method. *See* Foglia Aff. ¶¶ 101 & 102. Ms. Sangaline, who was familiar was TEACCH, described it as heavily visual and not appropriate in addressing C.K.'s needs or learning style. *See* Foglia Aff. ¶ 102. "While the CSE is required to consider certain evaluative information from the child's parents and teachers (or related service providers), the IDEA does not explicitly require that it consider all potentially relevant evaluations from the child's doctor." *M.Z. v. N.Y.C. Dep't of Educ.*, 2013 WL 1314992, at *8 (S.D.N.Y. March 21, 2013) (citing 20 U.S.C. § 1414(c)(1)(A)); *see also F.B. v. N.Y.C. Dep't of Educ.*, 2013 WL 592664, at *8 (S.D.N.Y. Feb. 14, 2013) (The IDEA "does not require that the team review every single item of

data available"). Moreover, "although a CSE is required to consider reports from private experts, it is not required to follow all of their recommendations." *M.H. v. N.Y.C. Dep't of Educ.,* No. 10 Civ. 1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb.16, 2011) (citations omitted); *see also T.S. v. Bd. of Educ.,* 10 F.3d 87, 90 (2d Cir.1993); *Tarlowe v. N.Y.C. Bd. of Educ.,* No. 07 Civ. 7936, 2008 WL 2736027, at *7–8 (S.D.N.Y. July 3, 2008).

## II. The *Burlington/Carter* Test

When a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents or guardians may unilaterally place the child in an appropriate private school and seek tuition reimbursement from the state. *See Sch. Comm. of Burlington, Mass. v. Dep't of Educ.,* 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) ("*Burlington*"); *Florence County Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) ("*Carter*"). Determining whether parents are entitled to tuition reimbursement requires district courts to engage in a three-pronged test, often referred to as the *Burlington/Carter* test. Under this test, plaintiffs are entitled to reimbursement if (1) the IEP was not "reasonably calculated to enable the child to receive educational benefits," (2) "the private schooling obtained by the parents is appropriate to the child's needs," and (3) equitable considerations support the plaintiffs' claim. *T.Y.,* 584 F.3d at 417 (citation omitted); *see also Forest Grove,* 557 U.S. at 246–47, 129 S.Ct. 2484 ("Parents are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act ... [a]nd even then courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant ...." (citation omitted)).

The parents felt that upon receiving the rejection letters from the school district, they were left with no option but to pursue the remaining option of private placement. Pl. Mem. at 22.

*Gagliardo,* 489 F.3d at 111 ("If parents believe that the state has failed their child in this regard, they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state."). However, "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *See R.E.,* 694 F.3d at 195

A court must first consider whether "the IEP proposed by the school district [was] inappropriate." *Gagliardo,* 489 F.3d at 111 (citing *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)). Second, the court must ask whether "the private placement [was] appropriate to the child's needs." *Id.* at 111–12 (citing *Burlington,* 471 U.S. at 370). Third, if both prongs are satisfied, a district court has broad discretion in granting an appropriate remedy, and "equitable considerations are relevant in fashioning relief". *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.,* 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385(1985); *see* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse the parents for the cost of that enrollment.") (emphasis added). Assessment of such costs "merely requires the [defendant] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington,* 471 U.S. at 370–71. "Because the State Review Officer[ ] in [this case] concluded that the IEP[ ] w[as] proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the respective Review Officer[ ] erred is properly understood to fall on the plaintiffs." *M.H. v. N.Y.C. Dep't of Educ.,* 685 F.3d 217, 225 n. 3 (2d Cir. 2012).

**III. Procedural Adequacy of the 2011–2012 IEP**

"At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (citation and internal quotation marks omitted). Procedural violations only entitle a parent to reimbursement "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *Id.* (citing *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F.Supp.2d 656, 659 (S.D.N.Y. 2005)).

An SRO "may rely on testimony that describes both an IEP's recommended method and 'why it was appropriate,' or testimony explaining how an IEP recommended service 'operates.'" *T.B. v. Haverstraw–Stony Point Cent. Sch. Dist.*, No. 11 Civ. 5421, 2013 WL 1187479, at *18 n. 12 (S.D.N.Y. Mar. 21, 2013) (quoting *R.E.*, 694 F.3d at 186–87; *see R.E.*, 694 F.3d at 185 ("[T]estimony regarding state-offered services may only explain or justify what is listed in the written IEP."). However, the SRO may not rely on "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP." *R.E.*, 694 F.3d at 186. For instance, "testimony that a different teaching method, not mentioned in the IEP, would have been used" may not be considered by the SRO. *Id.* at 186–87; *see also P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, Nos. 11–3525, 11–3633, 2013 WL 2158587, at *3 (2d Cir. May 21, 2013) ("Retrospective testimony is 'testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement.'") (quoting *R.E.*, 694 F.3d at 185).

The question is whether the IEP recommended a program appropriate to meet C.K.'s needs. In general, the Parties' dispute concerns the appropriateness of particular instructional programming and class size in addressing C.K.'s conditions, questions best left to the SRO or, if the SRO decision is inadequately reasoned, to the IHO. *See R.E.*, 694 F.3d at 189; *V.S.*, 2011 WL 3273922, at *13. Deferring to the well-reasoned and well-supported SRO decision on these matters of educational policy, the Court finds no basis on which to disturb the SRO's findings.

Federal and state regulations require that a child's parents be provided an opportunity to participate in the development of the child's IEP. 34 CFR § 300.322(a); 8 NYCRR § 200.4(d)(2). The Second Circuit has held that a parent receives such an opportunity when "[the parent] actively participate[s] in discussing [the student's] needs" and is "frequently consulted for input about the CSE [ ] [team's] proposed plan." *Cerra,* 427 F.3d at 193; *see also E.Z.-L. ex rel. R.L. v. N.Y.C. Dep't of Educ.,* 763 F.Supp.2d 584, 596 (S.D.N.Y. 2011), *aff'd sub nom. R.E.,* 694 F.3d 167. The undisputed facts in this case demonstrate that Plaintiffs had the opportunity to participate in the development of the IEP. These facts are substantially similar to those that the Second Circuit found sufficient in *Cerra,* 427 F.3d at 192–193. As such, the Court will defer to the SRO's conclusion that Plaintiffs had an opportunity to meaningfully participate in developing C.K.'s 2011–12 IEP and concludes that there was no procedural violation based on Plaintiffs' ability to participate in drafting the 2011–12 IEP. The SRO's well-reasoned conclusion is entitled to deference.

In addition, no procedural shortcoming deprived the student of educational benefits or impeded the student's right to a FAPE. *See R.E.,* 694 F.3d at 190.

## IV. Substantive Adequacy of the IEP

After determining whether a proposed IEP is procedurally adequate, "[c]ourts then examine whether the IEP was substantively adequate." *R.E.,* 694 F.3d at 190 (internal citation and quotation marks omitted). Any substantive inadequacy in a student's IEP results in the denial of a FAPE. *See M.W.,* 725 F.3d at 131 (2d Cir. 2013) (quoting *R.E.,* 694 F.3d at 190). The education provided must be "sufficient to confer some educational benefit upon the handicapped child." *Rowley,* 458 U.S. at 200. But "[t]he IDEA guarantees only that students with disabilities are provided "an 'appropriate education,' not one that provides everything that might be thought desirable by loving parents.") *See Bryant v. N.Y. State Educ. Dep't,* 692 F.3d 202, 215 (2d Cir. 2012) (quoting *Walczak,* 142 F.3d at 132).

"[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *R.E.,* 694 F.3d at 189 (citation omitted). "In order to avoid 'impermissibly meddling in state educational methodology,' a district court 'must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.'" *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 192 (2d Cir. 2005). (citation omitted).

In determining whether the IEP was appropriate, "the IEP must be evaluated prospectively as of the time of its drafting," and "both parties are limited to discussing the placement and services specified in the written plan and therefore known to the parties at the time of the placement decision." *R.E.,* 694 F.3d at 186–87. "[A] deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP," *R.E.,* 694 F.3d at 185. The converse is also true; a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not

22

before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE.

Plaintiffs claim that C.K.'s 2011–12 IEP was substantively inadequate because the program recommended in the IEP would have caused C.K. to regress. Pl. Mem. 11–15. Defendant urges the court to adopt the SRO's conclusion that any alleged deficiencies do not render C.K.'s 2011–12 IEP substantively inadequate.

As discussed below, the Court agrees with the SRO's conclusion that the goals in the IEP were appropriate. In a recent case from this district, *A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 5573(JMF), 2013 WL 4056216 (S.D.N.Y. Aug. 9, 2013), a CSE team met in January 2010 and developed a 2010–11 IEP largely based on the student's November 2009 school progress report. *Id.* at *8, *12. The court rejected plaintiffs' argument that the annual goals in the student's IEP were "redundant because if she were to achieve her 2009–2010 academic goals, there would be no benefit to the IEP for the 2010–2011 academic year," and noted that there was "no authority for the proposition that drawing goals from a teacher's progress report is a violation of the [applicable law] or regulations." *Id.* at *12; *see also M.S. v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 4454(LAK) (JCF), 2010 WL 9446052, at *23 (S.D.N.Y. Mar. 12, 2010) (upholding SRO's determination that goals copied from prior IEP were adequate). The Court agrees with that court's observations and conclusions.

In developing an IEP, a CSE is required to "review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or state assessments, and classroombased observations; and (iii) observations by teachers and related services providers...." 20 U.S.C. § 1414(c)(1)(A). The goals discussed at the CSE meeting incorporated the parents' considerations.

23

The annual goals in a student's IEP must contain "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal." 8 NYCRR § 200.4(d)(2) (iii)(b); *see also* 20 USC § 1414(d)(1)(A)(i)(II). In addition, the IEP must "identify when periodic reports on the progress the student is making toward the annual goals ... will be provided to the student's parents." 8 NYCRR § 200.4(d)(2) (iii)(c). However, "[t]he cases in this Circuit demonstrate that 'even where certain goals are overly broad, courts have found an IEP to be satisfactory where short-term objectives are sufficiently detailed.'" *E.F. v. N.Y.C. Dep't of Educ.,* No. 12 Civ. 2217(MKB), 2013 WL 4495676, at *19 (E.D.N.Y. Aug. 19, 2013) (quoting *C.D. v. Bedford Cent. Sch. Dist.,* 10 Civ. 5502(CM), 2011 WL 4914722, at *8 (S.D.N.Y. Sept. 22, 2011)).

Pursuant to the New York statute, a child's IEP must contain goals "relate[d] to" each of the child's educational needs. 8 NYCRR § 200.4(d)(2)(iii)(A); *see also* 39 C.F.R. § 300.320(a) (2)(i) (IEP must contain goals "designed to meet" child's needs). The statute does not require that the IEP contain goals that explicitly reference each need. The record here shows that, as required, C.K.'s IEP contained annual goals and short-term objectives.  As the SRO's determination is supported by the record, the Court defers to it and concludes that the goals were sufficient.

Plaintiffs argue that the SRO erred in failing to consider the testimony of Dr. O'Leary and Dr. McMahon regarding C.K.'s regressing test scores.  However, test scores are not the only metric of progress. It is undisputed that C.K. was benefiting socially from modeling typical peers. Even Dr. O'Leary recommended that C.K. "will benefit from opportunities to model typically developing peers. Such experience will allow her to improve social and communication skills that are currently detracting from her efficiency within the academic setting." *See* Foglia

24

Aff. ¶ 104. C.K.'s IEP allowed her access to typically developing peers whereas Pathways, as a school for autistic students, does not. Although Dr. O'Leary recommended Pathways for C.K., a CSE is obligated to recommend a placement that would be the "least restrictive environment" for the student. 20 U.S.C. § 1412(a)(5). "The law requires the district to evaluate the child's needs and to determine what is necessary to afford the child a FAPE." *W.S. v. Rye City Sch. Dist.,* 454 F.Supp.2d 134, 148 (S.D.N.Y. 2006). "Nothing in IDEA compels the school district to look for private school options if the CSE, having identified the services needed by the child, concludes that those services can be provided in the public school." *See A.D. v. N.Y.C. Dep't of Educ.,* No. 12 Civ. 2673, 2013 WL 1155570, at *7–8 (S.D.N.Y. Mar.19, 2013). Dr. O'Leary's testimony cannot "overcome the 'particularly important' deference that we afford the SRO's assessment of the plan's substantive adequacy." *Cerra,* 427 F.3d at 195.

Moreover, Plaintiffs cannot establish that the school district was unwilling or unable to obtain small bus for transportation or Assistive technology in the home. *See Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.,* 12 Civ. 2113(WHP), 2012 WL 6136493, at *7 (S.D.N.Y. Dec. 11, 2012). Even if Plaintiffs were able to show that the proposed placement would underserve C.K., "documents show[ing] that a large percentage of the students at [the proposed school] have been and continue to be underserved for related services, particularly as to occupational therapy .... cannot overcome the 'particularly important' deference ... afford[ed] to the SRO's assessment of [an IEP]'s substantive adequacy." *F.L. ex rel. F.L. v. N.Y.C. Dep't. of Educ.,* 2012 WL 4891748, at *16 (quoting *R.E.,* 694 F.3d at 195).

The SRO's decision as to whether the IEP provided C.K. with a FAPE was adequately reasoned. The SRO's determinations with regard to the substantive adequacy of C.K.'s 2011–12 IEP were well supported by the record and are entitled to the full degree of deference. As did the

SRO, the Court finds that C.K.'s 2011–12 IEP was adequate. Accordingly, C.K. was not denied a FAPE.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the 2011–12 IEP was both procedurally and substantively adequate. As such, the Court need not reach Plaintiffs' claims regarding the propriety of their unilateral placement of C.K. at the Pathways School. In any event, Plaintiffs have not persuasively shown that C.K. progressed academically at Pathways.

Regardless of the adequacy of that school, defendant need not reimburse Plaintiffs for tuition for the 2011–12 school year because it offered C.K. a FAPE for that year. Defendant's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Summary Judgment is DENIED in full.

This Memorandum and Order resolves Docket Numbers 9 and 20. The Clerk of the Court is directed to terminate this action.

Dated:  December 23, 2013
      White Plains, New York

SO ORDERED:

_____ 12/23/13

NELSON S. ROMÁN
United States District Judge

26